IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DANIEL A. CHAPPELL                                                                                          PLAINTIFF

v.                                                        CASE No. 07-5219

SHERIFF TIMOTHY HELDER;
WASHINGTON COUNTY, ARKANSAS                                                                DEFENDANTS

REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Daniel Chappell (Plaintiff) filed this *pro se* civil rights action under 42 U.S.C. § 1983 on December 3, 2007. (Doc. 1). Plaintiff's Complaint was filed *in forma pauperis* (IFP) and certified to proceed on that same date. (Docs. 2, 3). The undersigned held an evidentiary hearing on October 1, 2009, regarding Plaintiff's claims of denial of free exercise of religion, impermissible establishment of religion, and denial of access to the Courts. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), this case is referred to the undersigned by the Honorable Chief Judge Jimm Larry Hendren for the purpose of issuing a report and recommendation. Accordingly, the Court issues this Report and Recommendation.

**I. Background and Witnesses Presented**

At the evidentiary hearing I heard testimony from the following witnesses in the following order: (1) Thomas Russell, (2) Jerry Sykes, (3) Daniel Chappell, and (4) Randall Denzer. The testimony of these witnesses is summarized below.

A. Thomas Russell

My name is Thomas Russell and I was in the Washington County Detention Center for approximately nine months, which included October of 2007.

During the time we, the inmates, were put out to the day room in the morning, at lunch, and in the evening. We could not return to our cells and during this time, which was also the time the majority of the religious presentations were made. At times, we were not locked out of the cells, and could go there as needed, even if a presentation was being made.

At the early morning lockout, around 5:00 a.m., we were only permitted to have the Holy Bible. Sometimes inmates would sneak out other books, but if the inmates were caught, it would be punishable. We snuck out novels and willfully violated the policy.

I am currently serving a sentence for sexual abuse and terroristic threatening at the Varner Unit of the Arkansas Department of Corrections. When I was in Washington County, I was in the same cell as Plaintiff Chappell.

We were locked in all night in our cells, and locked in the day room with the cell doors locked during the lockout periods. There was no place to go at the times we were locked out of our cells. During lockout, there were approximately thirty inmates in the day room.

We were not forced to sit, and no officer forced us to sit and listen to the religious presentations and we could move about the day room. I think the presentations were a good idea.

The distance was similar as from the witness stand to the lectern in the courtroom. The day room was pie shaped and about three fourths the length of the courtroom. Due to all of the hard surfaces of the day room, one could hear what was said quite well.

The religious presentations occurred about three times a week. These presentations were by lay persons and volunteers. Additionally, materials would be distributed to everyone, but we were not forced to take them. There may be up to three or four presenters at one time, they might bring a tape player, sing, or the like. Other prisoners would also participate.

The presentations were non-denominational, and would last from thirty minutes to one and a half hours in length. The presentations were not always at one place, but they would sit at different tables around the room from day to day. Sometimes participants would be asked to make a decision or have an altar call.

I did not file a grievance about these presentations. I tried to block my ears, but no one was talking other than the presenters. There was no television in the day room, either.

I was a cell mate of the Plaintiff. I heard him ask to bring out a book called Dianetics instead of the Holy Bible at the morning lock out and he was denied. I know he filed grievances on the matter. Plaintiff wanted to be separated from the services.

The morning lockout time was the only time we were restricted to the Holy Bible. At other times, we could bring any book out.

I saw books returned, but I never saw an inmate get lockdown for having a book other than the Bible.

B.  Jerry Sykes

I was in the Washington County Detention Center from 2007-2008. We would have lockout from 5:00 am until about 7:00 a.m. The doors would open from 7:00 a.m. until 8:30 or 9:00 a.m. We would be locked out again from 9:00 a.m. until 1:00 or 2:00 p.m. The cells would open from 2:00 p.m. until 4:00 p.m. and then we would be locked out from 4:00 p.m. until 8:30 p.m.

This was the schedule twenty-four hours a day, seven days a week, except for about a ten day period when the doors were open for twenty-four hours a day.

During the morning lockout of 5:00 to 7:00 a.m., the only reading material allowed outside of the cells was the Holy Bible. I filed many grievances, although I came to believe it was pointless,

because there was no answer and it appeared to achieve no result.

Street people would come in and hold services and meetings. There were approximately eight tables. We were forced to participate in the services because they were in the middle of us.

The day room is approximately the size of the gallery area of the courtroom.

I met Plaintiff in December of 2007 or January 2008. No one told us we had to sit and listen to the presentations. I say they were forced on us because even if you did not participate, you still had to hear it. You could walk around the day room, but you had to hear what was being said.

I am currently in the Arkansas Department of Corrections on a capital murder charge.

I can not remember if the presentations were ever made when the doors were open and we could return to our cells. There was no set time for them to come and give presentations.

The presenters would raise their voices, and they had materials to hand out during the presentations.

I do not remember filling out any grievances myself about not wanting to be part of the presentations.

This occurred in the "N" pod, which had about thirty-two (32) people.

C.  Daniel Chappell

I am the Plaintiff in this action. I was incarcerated in the Washington County Jail from August of 2007 until January of 2009.

When I was incarcerated, I began to have religious questions and do religious study. To this end, I had several books I read to gain more information. I was not allowed to have these books at the early lock-out time. I asked and was told that only the Holy Bible was allowed. There was no limit to just one book.

Sometimes during the religious presentations, the doors to our cells would be open. Usually, this was not the case. The Defendants would not let me separate myself from the presentations, although I asked to be left out. I was not asked to sit in the presentations, but I did have to hear them.

I also asked to use the law library and included the case number and the fact I was proceeding pro se. The response was to contact my attorney.

Regarding the religious presentations, the dayroom was 60 paces around. Some presenters would take those who wanted to study to a table and they would quietly discuss the topics among themselves. However, other presenters would get up on tables and the steps when preaching and they would direct the presentation to the dayroom as a whole.

The schedule at the Washington County Detention Center was as follows: 4:40 to 5:00 a.m., lockout of cells; 7:00 a.m., back in; 9:00 a.m. lockout until 2 or so, then let back in cells. Finally lock out again from 4:00 p.m. until 8:00 p.m.

To the best of my knowledge, there was so set time for the religious presentations – the presenters would come on their own schedule. If the presenters were there during a time we were free to go to our cells, then we could leave. If the presenters came during a lockout time, we were forced to remain in the room and overhear the services.

At times I was called on by the person preaching or delivering the service. I was asked if I was "saved" and if I ignored them or stated I wasn't interested, then I was told I was "going to hell" or would "burn in the lake of fire." I was encouraged to get saved and told "don't be scared."

I consider that I had a difference of opinion regarding religion than the presenters did. However, either I had to listen to their point of view, lie, or argue with them. I was unable to escape.

I was also used as an example, more than once, of someone who would "burn in hell."

I was not forced to sit, but I had no way to avoid hearing. I was forced to be in the room, forced to listen. No defendant or jailer told me I had to participate. They did tell me I must remain in the room while the presentations were held.

Regarding the policy of no book other than the Holy Bible allowed at lock out, this was only for the 5:00 a.m. to 7:00 a.m. lockout. The other 22 hours of the day I could have my choice of book. One of the books I requested on lock out was *Dianetics*. This book is the foundation of Scientology. I never read this book for twenty-four straight hours. I could read it except for the two hours every morning of lockout.

I have no religion I currently adopt. I study only. I would characterize the harm I suffered as mainly psychological.

Regarding my claim I was denied access to the Courts, I had no public defender on this case. However, I had a lawsuit filed anyway. I had a complaint form, but I don't remember that it stated I only needed facts, not legal analysis. My concern that if I had the legal materials I needed and requested, then I could have added facts that were relevant, but that perhaps I did not know were relevant. I also considered a class action, but I did not have the materials available to research this type of lawsuit.

D. Randall Denzer

My name is Randall Denzer, I am the Jail Administrator of the Washington County Sheriff's Department, and I served in that capacity at the relevant time in question.

The policy of the Washington County Detention Center regarding religious presentations is that anyone can come in and have services as long as there is no security threat. We do not limit to

any specific religions. These presentations are held in the dayroom, due to security and safety concerns. We do have a multipurpose room, but it is not used in this way. There are different times for each of the presentations, but no set times. If the presenters come when the cells are open, then the inmates are free to enter the bunk area. If the presenters come during lockdown, the inmates remain in the dayroom.

In the first two hours of the morning, when the inmates are locked out we are trying to get all of the inmates food, medication, and transport them to where they need to go for court appearances and the like.

The schedule of the Detention Center is as described previously. The inmates are on lockout from when they get up at 5:00 a.m. until 7:00 a.m. Inmates are locked out again at 9:00 a.m. until 1:00 p.m. And then at 3:00 p.m. the inmates are locked out until the evening.

If the inmates were not on lockout at certain times of the day, there would be a security issue regarding fighting and other problems with all-day inmate access to cells.

The inmates can have their own materials. They also have access to phones and a radio station which is changed daily. The dayroom is three-fourths the size of the courtroom and has two stories. If you are in the dayroom, you will overhear what is going on. The sound is muffled at a distance, and there is no amplification of the voices of any of the presenters.

An inmate may have whatever religious text he or she would like in segregation or dayroom. Regarding Plaintiff's exhibit 8, a grievance form, the response by officer Caudle was that only a Bible was allowed at unlock. This was an incorrect response by the officer.

Regarding case document 17, exhibit 5 and number 5, Captain Osborn stated the only book at segregation was a "Holy Bible." This is also a mistake. The policy of only allowing a religious text

is in the training material for new hires. We have no list of approved religious texts for lockout. If a text was requested I would ask the Chaplin and the County Attorney. I would now consider Dianetics to be a religious text as defined by the morning lockout policy. I made that decision myself, without consultation to the Chaplin or County Attorney. After that decision, the only two approved texts would be the Holy Bible and Dianetics.

Religious presentations usually do not occur during morning lock out. Generally, they are later in the day.

The policy of the Detention Center regarding access to the Court is that if the inmate has a public defender or attorney, they are referred to that attorney. If it is a civil case where the inmate is pro se, then the inmate may request a specific title of a legal book and it will be provided. There is no law library in the jail.

## II. Discussion

### A. Free Exercise of Religion

Plaintiff has claimed religious presentations in the dayroom during lockout times contravene the Free Exercise Clause of the Constitution because he is forced to be included in these sessions, and can not remove himself, but must overhear the presentation.

The leading Eighth Circuit case on this point appears to be *Campbell v. Cauthron*, 623 F.2d 508 (8th Cir. 1980), which was brought by a class of inmates at the Sebastian County, Arkansas Detention Center. In *Campbell*, the Eighth Circuit stated that the record contained indications it was "nearly impossible for the inmates to 'escape' the preaching" of lay witnesses who were allowed into the cell block. *Id.* at 509. It was this "forced inculcation" the Eighth Circuit said would "clearly contravene" the Free Exercise Clause. *Id.* The Court then went on to state the jail officials "must

take steps, subject to the approval of the district court, to ensure that no inmate is subjected to forced religious indoctrination." *Id.*

The evidence presented at the hearing was clear that Plaintiff was confined to the day room during most of the religious presentations. Plaintiff could overhear the presentations, and could not remove himself because he could not leave the room and because attempts to disengage himself were unsuccessful. Plaintiff testified he was included in the presentations at times because the presenters would call on him, ask questions of him, or use him as an example. Clearly, it was "nearly impossible for the inmates to 'escape' the preaching" as was found impermissible in *Campbell*. *Id.* Although Plaintiff was not told to sit and listen, nor was he forced to participate, there was a "forced inculcation" in the fact that Plaintiff was unable to remove himself to a place where he did not have to hear the presentations.

Although it is my recommendation that Plaintiff prevail on his claim that the religious presentations contravene the Free Exercise Clause of the Constitution, the remedy for the Defendants may be a simple one. Defendants testified there was no set time for religious presentations to occur, so there was no control of whether the inmates would be on lockout and confined to the dayroom when the presenters arrived. Simply scheduling all religious presentations to occur during those times of the day where the inmates may freely leave the dayroom and return to their cells may be a solution. Additionally, the detention center could provide a separate room for the presentations, with those inmates who choose to attend. There was some indication this had been the policy at one time, but was not effective from an operations standpoint. Perhaps such a policy could be revisited.

Moreover, while my recommendation is in Plaintiff's favor on his Free Exercise Claim, I recommend nominal damages should be awarded. Due to the need for a change in policy to occur,

it is my further recommendation that Defendants be required to submit their new policy to the Court, within a time frame acceptable to the district court, for review.

### B. Establishment of Religion

Plaintiff has claimed the Defendants created an impermissible establishment of religion by allowing only the "Holy Bible" when he was on his morning lockout from approximately 5:00 a.m. until 7:00 a.m. The Defendants stated that during this time, the inmates were allowed one religious text. Plaintiff and other inmates testified at hearing that only the "Holy Bible" was allowed.

Many cases have found that prohibiting "most other" reading materials, while establishing an exception for "Bibles" or the like, constitutes a governmental encouragement or establishment of a particular religious doctrine. *See, e.g., Parnell v. Waldrep*, 511 F. Supp. 764 (D.C. N.C. 1981) (holding the refusal to allow inmates paperback books, magazines, and newspapers is unconstitutional and the jail can not prohibit the receipt of these reading materials while allowing an exception for "Bibles and 'little Christian tracts'" without violating the Establishment Clause). The establishment clause clearly applies to state action. *Everson v. Board of Education*, 330 U.S. 1 (1947).

In this case, the Policy Manual of the Washington County Detention Center, which was provided by the Defendants after the hearing was held in this matter, is silent as to the "one religious text" policy. However, the Washington County Detention Center Detention Training Officer (D.T.O.) Manual, which was also provided to the court after the hearing was held, does mention the policy. The policy is mentioned on page 116 of the 134 page manual. The page is titled "Lockdown/Protective Lockdown (Unlock-Lockout Periods)" and it provides a rubric of what practices are acceptable by jailers at lockout and unlock periods. It is considered "#1 unacceptable" to allow "detainees to bring personal properties other than religious text at 5 AM unlock." Likewise,

in the section labeled "#3 acceptable" the manual states "[d]uring unlock at 5 AM detainees will be allowed to bring one form of religious text out of the cell." These are the only references made in the training manual to any restrictions on material at the 5:00 a.m. lockout.

The testimony was credible, and the training manual supports, that the intention of the morning restriction of reading material was to keep a minimum amount of interference with the meal, medication, and transportation procedures the jail had to complete at that time. Also, it is apparent the intention was to limit the inmates to a religious text. However, the intended policy is not the one which was implemented at the Washington County Detention Center.

All of the former inmates of the Detention Center gave credible testimony they were told by the jailers that the limit was to the Holy Bible. When Plaintiff wrote a grievance on February 4, 2008, regarding the policy, he had been told first by Deputy Walker that his chosen text, Dianetics, could not come out as the restriction was to the Holy Bible only. Walker's belief the policy was to limit to the Holy Bible was also shared by Cpt. Caudle who answered the grievance, responding that "nothing but a Bible comes out at unlock." (Def. Ex. 8). Moreover, when this case was at the Summary Judgment stages, Defendants filed an Affidavit (Doc. 17-4), by Captain Osburn which stated in the sentence numbered seven that "[i]nmates are not allowed to possess reading material in segregation, with the exception of a Holy Bible." Captain Osburn signed this affidavit, and clearly he believed the policy of the Detention Center to be reflected therein. Additionally, this statement was reiterated by the Defendants in their Statement of Facts (Doc. 17) and also in the Brief Supporting the Motion for Summary Judgment (Doc. 16).

Thus, clearly the policy being implemented by Walker, Caudle, and Osburn was a policy that only the Holy Bible was allowed at the 5 a.m. lockout. This policy was also apparently the

understanding of Defendant Helder, the named party in this case, as it is assumed he consulted with his attorney regarding the documents filed in this case, supplied information for those documents and approved what was filed with the Court.

The policy of one religious text at the 5 a.m. lockout is not solely flawed in its implementation. It is clear from the testimony, as well as the training and policy manuals produced after the hearing, there was also no definition or standard of what a "religious text" would encompass.

Randall Denzer testified that to determine if a book was a "religious text" the jail would consult with the county attorney and the Chaplin. However, when Plaintiff filed his grievance on February 4, 2008, there was no consultation with the Chaplin or the county attorney to determine if Dianetics would be considered a religious text – Plaintiff was simply denied his book because it was not the Holy Bible. The policy for such a consultation is not in either the policy manual or the training manual provided to the Court. In addition, at the hearing, Denzer testified that he would now consider Dianetics to be a "religious text." He stated he made that determination himself, without consulting the Chaplin or the county attorney, as he stated would be the proper procedure. Denzer also stated at this time the only two "religious texts" approved by the detention center would be the Holy Bible and Dianetics.

For these reasons, I recommend Plaintiff prevail on his establishment of religion claim. The implemented policy of the Washington County Detention Center is to only allow the Holy Bible at the 5 a.m. lockout, which is constitutionally impermissible. There are also no safety or other legitimate interests of the detention center which would allow this policy to go forth. I also recommend Plaintiff be awarded nominal damages.

Again, Defendants' solution may be a simple one. To limit by number alone, rather than by

type of book, may achieve the Detention Center's goals for the 5 a.m. lockout, without running afoul of the establishment clause. For example, a limit to only one text may be a simple alternative. However, if the Detention Center wishes to retain its restriction on a religious text, then a definition and/or standards for determining whether a book is a "religious text" may be necessary to safeguard the constitutional rights of the inmates. The evidence at hearing was definitive that the process to determine if a book qualifies for the "religious text" restriction is quite uncertain.

Due to the need for a change in policy to occur, it is my further recommendation that Defendants be required to submit their new policy to the Court, within a time frame acceptable to the district court, for review.

### C. Denial of Access to the Courts

Plaintiff claims he was denied access to the Court because he sought to use the law library to research and prepare for the case at bar, but he was not allowed to do so. Specifically, he was told to contact his attorney in his criminal case, a public defender.

"To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *White v. Kautzky*, 494 F.3d 677, 680 (8th Cir. 2007) (citations omitted). "To prove actual injury, [a prisoner] must 'demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded.'" *Id.* (quoting *Lewis v. Casey,* 518 U.S. 343, 353 (1996)).

While the policy of allowing inmate access to telephones for calling his or her attorney might suffice for most inmates awaiting trial, who are constitutionally entitled to appointed counsel at trial,

it does not insure that convicted inmates or pretrial detainees seeking to file federal and state petitions for habeas corpus or post-conviction relief, and civil rights suits, will have meaningful access to the courts. The Supreme Court required that such access be provided to inmates in *Bounds v. Smith*, 430 U.S. 817 (1977). Here, it is clear the Plaintiff informed Defendants he was seeking help on his pro se case, and thus the response to him to "contact his attorney" is inadequate. Additionally, Randall Denzer stated the policy for pro se inmates was to allow them to request a title of a legal book, and that book would be provided to them, as there is no law library at the detention center. Clearly, no one informed Plaintiff that he could request books in such a manner, as would have been the appropriate response, especially to his grievance regarding the situation.

However, an access to the Courts claim requires an injury on behalf of the Plaintiff. Plaintiff testified that without access to a library he was unsure of which facts to tell the Court, and he was unable to determine if his case should proceed as a class action. There is no evidence Plaintiff suffered an actual injury by the the hindrance of a nonfrivolous and arguably meritorious underlying legal claim. It is my recommendation Plaintiff's Complaint be dismissed as to his claim of denial of access to the Courts.

**III. Conclusion**

For the reasons stated above, it is my recommendation that judgment be entered for the Plaintiff on his claims Defendants violated the establishment clause and violated his right to free exercise of religion. It is also my recommendation that Plaintiff's Complaint be DISMISSED as to his claim he was denied access to the Courts. I also recommend nominal damages be awarded to the Plaintiff on both his establishment clause claim and free exercise claim, as well as costs be awarded to Plaintiff. It is my further recommendation that the District Court establish a deadline for the

Defendants to submit their new policies regarding religious presentations and the materials inmates can retain at the 5 a.m. lockout for further review by the Court.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**IT IS SO ORDERED** this **14th day of December 2009.**

/s/ *J. Marschewski*
HONORABLE JAMES R.  MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE